Ben D. Kappelman
Briana Al Taqatqa
**DORSEY & WHITNEY LLP**
Millennium Building
125 Bank Street, Suite 600
Missoula, MT 59802
(406) 721-6025
kappelman.ben@dorsey.com
altaqatqa.briana@dorsey.com

*Attorneys for Defendant Nevro Corp.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| Kevin Brodock, | ) | |
| Plaintiff, | ) | Cause No. 1:20-cv-00110-SPW-TJC |
| -vs- | ) | **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** |
| Nevro Corp., a Delaware corporation, | ) | |
| Defendant. | ) | |
| | ) | |

# **TABLE OF CONTENTS**

Table of Authorities ................................................................ iii

Exhibit Index ........................................................................vi

Introduction ...........................................................................1

Alleged Facts.........................................................................2

I.    Plaintiff Was Initially Hired as an At-Will Employee ...................................2

II.   Plaintiff Accepted an Amendment to His Employment Agreement So that He Was Employed for a Term.......................................................................4

III.  Plaintiff Agreed that He Could Be Terminated For Failing to Meet 70% of His Sales Quota in Two Consecutive Quarters ...............................................5

IV.   Plaintiff Alleges He Was Terminated for Failing to Meet His Quotas ...........7

V.    After Plaintiff's Termination, Nevro Told Plaintiff It Would Not Enforce His Non-Compete........................................................................7

Legal Standard ....................................................................11

Argument...........................................................................13

I.    Plaintiff's WDEA Claim Should Be Dismissed Because He Was Covered by a Written Contract of Employment for a Specific Term. ...........................13

II.   Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed Because the Express Provisions of His Employment Agreement Govern His Grievances ........................................16

III.  Plaintiff's Tortious Interference Claim Should Be Dismissed Because Nevro Had a Legal Right to Tell Plaintiff to Follow His Agreements ....................18

IV.   Plaintiff's Infliction of Emotional Distress Claim Should Be Dismissed Because His Allegations of Distress are Insufficiently Severe ....................21

V.    Plaintiff's Declaratory Judgment Claim Should Be Dismissed because there is No Case or Controversy About Plaintiff's Non-Compete or a Non-Disparagement Agreement ...........................................................23

Conclusion .........................................................................27

Certificate of Compliance ......................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 12

*Associated Mgmt. Servs., Inc. v. Ruff*,
424 P.3d 571 (Mont. 2018) ............................................................. 15, 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................. 12

*Boyd v. Keystone Const.*,
No. 1:14-CV-119-WTL-MJD, 2015 WL 4427630 (S.D. Ind. July
20, 2015) ............................................................................................. 20

*Brown v. Yellowstone Club Operations, LLC*,
255 P.3d 205 (Mont. 2011) ............................................................. 14, 16

*Christian Legal Soc. v. Eck*,
625 F. Supp. 2d 1026 (D. Mont. 2009) ............................................. 14, 15

*Cramer v. John Alden Life Ins. Co.*,
763 F. Supp. 2d 1196 (D. Mont. 2011) ............................................... 7, 13

*Daniels–Hall v. National Education Assoc.*,
629 F.3d 992 (9th Cir. 2010) ............................................................... 13

*Farris v. Hutchinson*,
838 P.2d 374 (Mont. 1992) ......................................................... 14, 17, 18

*Green v. Eagle Bank*,
No. CV 13-159-M-DWM-JCL, 2013 U.S. Dist. LEXIS 171145 (D.
Mont. Nov. 7, 2013) ............................................................................. 23

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1989) ............................................................. 24

*Hart v. PacificSource Health Plans*,
No. CV 18-56-BU-BMM-JCL, 2019 WL 4044050 (D. Mont. June
18, 2019) ............................................................................................. 23

*Howard v. Octagon, Inc.*,
  No. C 13-1111 PJH, 2013 WL 5122191 (N.D. Cal. Sept. 13, 2013) ................25

*Intri–Plex Technologies v. Crest Group, Inc.*,
  499 F.3d 1048 (9th Cir. 2007) .............................................................12

*Johnson v. Fed. Home Loan Mortg. Corp.*,
  793 F.3d 1005 (9th Cir. 2015) ....................................................13, 14

*Jonas v. Lake Cty. Leader*,
  953 F. Supp. 2d 1117 (D. Mont. 2013)...........................................3, 12

*Mintz v. Mark Bartelstein & Assocs. Inc.*,
  906 F. Supp. 2d 1017 (C.D. Cal. 2012) ............................................25

*Montanans for Cmty. Dev. v. Motl*,
  No. CV 13-70-H-CCL, 2014 WL 977999 (D. Mont. Mar. 12,
  2014) ...........................................................................................13, 24

*Peterman v. Republican Nat'l Comm.*,
  320 F. Supp. 3d 1151 (D. Mont. 2018)..............................................19

*Pospisil v. First Nat'l Bank of Lewistown*,
  37 P.3d 704 (Mont. 2001).................................................................20

*Puryer v. HSBC Bank USA, Nat'l Ass'n*,
  419 P.3d 105 (Mont. 2018)........................................................21, 22

*Quinlivan v. Brown Oil Co.*,
  29 P.2d 374 (Mont. 1934).................................................................21

*Rocky Mountain Biologicals, Inc. v. Microbix Biosystems, Inc.*,
  986 F. Supp. 2d 1187 (D. Mont. 2013)........................................19, 21

*Sacco v. High Country Indep. Press*,
  896 P.2d 411 (Mont. 1995)......................................................21, 22, 23

*Scott v. Pasadena Unified Sch. Dist.*,
  306 F.3d 646 (9th Cir. 2002) ............................................................24

*Taylor v. Anaconda Fed. Credit Union*,
  550 P.2d 151 (Mont. 1976)................................................................20

*Tvedt v. Farmers Ins. Grp. of Companies*,
    91 P.3d 1 (Mont. 2004)..................................................................................16

*United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*,
    145 F. Supp. 3d 932 (C.D. Cal. 2015) .................................................24

*Warrington v. Great Falls Clinic, LLP*,
    443 P.3d 369 (Mont. 2019)..................................................................22

*Wingfield v. Dep't of Pub. Health & Human Servs.*,
    463 P.3d 452 (Mont. 2020)...........................................................19, 20

*Winslow v. Montana Rail Link, Inc.*,
    16 P.3d 992 (Mont. 2000)......................................................................14

## Statutes

Mont. Code Ann. § 27-1-310.....................................................................22

Mont. Code Ann. § 39-2-912............................................................13, 16

28 U.S.C. § 2201......................................................................................23

## Other Authorities

Fed. R. Civ. P. 8................................................................................11, 12

Fed. R. Civ. P. 12......................................... 2, 7, 11, 12, 13, 17, 23, 24

## <u>EXHIBIT INDEX</u>

All exhibits are attached to the Declaration of Kathleen Determann, filed herewith

| EXHIBIT | DOCUMENT |
|:---:|:---:|
| A | Brodock 2016 Offer Letter Agreement |
| B | Brodock Proprietary Information and Inventions Agreement |
| C | Brodock 2018 Amendment to the Offer Letter Agreement |
| D | Brodock Proposed Separation Agreement |
| E | January 17, 2020 Email from Nevro HR to Brodock |
| F | January 23, 2020 Email from Brodock to Nevro Executives |
| G | January 31, 2020 Email from Determann to Brodock |

**INTRODUCTION**

This is a breach of contract action that Plaintiff has dressed up as a tort case. Plaintiff had an employment contract with Nevro for a term ending December 31, 2020.  The contract provided that Plaintiff could be terminated if he failed to meet 70% of his sales quota for two consecutive quarters.  Plaintiff alleges he was terminated for failing to meet his quotas.  Plaintiff asserts the quotas were unreasonable.  This case is no more complex than this dispute.[1]

Yet Plaintiff adorns his allegation that his quotas were unreasonable with claims for statutory wrongful discharge, breach of the implied covenant, infliction of emotional distress, tortious interference with prospective economic advantage, and a declaratory judgment action.  All of these extra claims should be dismissed. Montana's Wrongful Discharge from Employment Act does not apply to Plaintiff's discharge because he was covered by a contract of employment for a term. Plaintiff's implied covenant claim fails because the breach he alleges is addressed in the express language of the contract.  Plaintiff comes nowhere near alleging emotional distress "so severe that no reasonable person could be expected to endure it," as is required to support an independent claim for infliction of

---

[1] Count II is Plaintiff's breach of contract claim.  Defendant denies the allegations in Count II, although Defendant does not seek dismissal of that count in this motion.

emotional distress.  Plaintiff does not plausibly allege tortious interference because he does not claim Nevro did anything other than tell Plaintiff that it expected him to comply with his employment agreement.

Plaintiff's declaratory judgment claim should be dismissed under Rule 12(b)(1) because it does not present a case or controversy, given that Nevro told Plaintiff it would not enforce his non-competition agreement and the Court should not adjudicate a hypothetical dispute over what Plaintiff can say to potential employers.

The Court should decline Plaintiff's invitation to turn a contract dispute over reasonableness of sales quotas into a wide-ranging tort case.  The Court should dismiss Counts I and III – VI of the Complaint.

## ALLEGED FACTS

### I.    Plaintiff Was Initially Hired as an At-Will Employee

Nevro is a medical device company and Brodock was hired as a sales person responsible for selling Nevro products and servicing its clients in Montana and Casper, Wyoming.  Plaintiff began working for Nevro in October 2016.  Compl. ¶¶ 12-13.  The Complaint refers to an "employment agreement," and various terms purportedly therein.  Compl. ¶¶ 12-13, 15, 26, 28, 38, 47, 50.  The "employment agreement" is a September 7, 2016, Offer Letter Agreement that Plaintiff signed on

September 9, 2016 (the "2016 Agreement").  Determann Decl. Ex. A.[2]  The 2016

Agreement states that Plaintiff's employment at Nevro was at will and that the

Agreement is governed by Montana law.  *Id.* at 2.

Plaintiff was initially hired as a District Sales Manager, with base

compensation of $60,000, eligibility for a cash bonus of up to $180,000, and other

benefits.  Compl. ¶¶ 13-17.  The 2016 Agreement provided that "[b]onuses shall be

determined based upon [Plaintiff's] achievement of defined performance goals, as

reasonably determined by NEVRO management…."  Determann Decl. Ex. A at 1.

Plaintiff alleges he "routinely exceeded his sales quotas by substantial percentages

and his successes and value to the company were reflected in various awards,

bonuses and commendations."  Compl. ¶ 21.

The 2016 Agreement also included a non-competition provision:

By signing below, you also agree that during your employment with
the Company and for a period of one (1) year after any termination of
your employment with the Company, you will not directly or
indirectly (i) solicit, induce, recruit or encourage any employee,
consultant or independent contractor employed or engaged by the
Company to terminate his or her employment or engagement; (ii)
divert or attempt to divert from the Company any business with any
customer, client, member, business partner or supplier; or (iii) within

---

[2] The Court may consider the Offer Letter Agreement, and the amendment thereto
discussed below, without converting this motion into one for summary judgment
because the documents are referred to throughout the Complaint, they are central to
Plaintiff's claims, and authentic.  *See Jonas v. Lake Cty. Leader*, 953 F. Supp. 2d
1117, 1123 (D. Mont. 2013).

any state in the United States in which you performed your work for
the Company, directly or indirectly enter into or engage in a business
similar to that of the NEVRO or otherwise in competition with the
business of NEVRO, whether as an owner, partner, joint venturer,
employee, consultant, agent, officer, director, or in other capacity
whatsoever. You further agree that the above restrictions are
necessary for NEVRO to protect its confidential and proprietary
information, goodwill, customer relationships, and employee
relationships…..

Determann Decl. Ex. A at 1.

## II.  Plaintiff Accepted an Amendment to His Employment Agreement So that He Was Employed for a Term

In 2018, Plaintiff accepted Nevro's offer of what Plaintiff calls a

"Retainment Agreement."  Compl. ¶¶ 23-30.  The so-called "Retainment

Agreement" was actually an Amendment to the Offer Letter Agreement that

Plaintiff signed in 2016 (the "Amendment").  Determann Decl. Ex. C.

The Amendment recited that Plaintiff was employed at Nevro pursuant to

the 2016 Agreement.  *Id.* at 1.  The Amendment provided that "[i]f you accept the

terms of this [Amendment], then your Offer Letter Agreement will be amended

and modified as set forth herein…."  *Id.*  Plaintiff accepted the Amendment on

December 14, 2018.  *Id.*

Pursuant to the Amendment, Plaintiff would "be employed by NEVRO for a

fixed term commencing on [December 14, 2018] and continuing until December

31, 2020."  Determann Decl. Ex. C at 1.  The Amendment made clear that "this

modifies your prior at-will employment status such that your employment during the Term is not at-will." *Id.*

### III.  Plaintiff Agreed that He Could Be Terminated For Failing to Meet 70% of His Sales Quota in Two Consecutive Quarters

The Amendment permitted Nevro to terminate Plaintiff for "Cause" as defined therein. *Id.* at 2-3. "Cause" is defined as:

> **any one or more of the following**: (i) your commission of any felony or crime involving dishonesty; (ii) your participation in any fraud, misrepresentation, omission of material fact, or other act of dishonesty against the Company; (iii) your willful breach of your contractual, statutory or common law duties to the Company or any third-party (including, but not limited to, your violation or breach of any provision, representation, or obligation under the Offer Letter Agreement, this Amendment, or the Proprietary Information and Inventions Agreement), (iv) your habitual neglect of any duty detailed in section (iii); (v) your continued incapacity to perform any duty detailed in section (iii); or **(vi) consistent failure to demonstrate adequate performance of your sales-related duties, as evidenced by two consecutive quarters during the Term of failure to meet 70% of your sales quota under the Plans**; provided however, that a breach, neglect, or nonperformance as set forth in clauses (iii), (iv), or (v) shall constitute Cause only if it is not cured to the reasonable satisfaction of NEVRO within 30 days following NEVRO's written notice to you of such breach, neglect, or nonperformance.

Determann Decl. Ex. C at 2 (emphasis added).

The Amendment provided that "NEVRO shall also guarantee you your base salary plus 85% of your target bonus as a minimum for each quarter during the Term in which you meet 70% of your sales quota as defined in the Plans." Determann Decl. Ex. C at 2.  The "Plans" referred to in subsection (vi) are the

Sales Compensation Plan and the Large Territory Sales Compensation Plan. *Id.* at 1.

The Amendment stated that "[i]f, during the Term … NEVRO terminates your employment without Cause, such termination will be deemed a material breach of this Amendment and the non-breaching party shall be entitled to seek all rights and remedies under this Amendment and applicable law." *Id.* at 2.

Plaintiff alleges that "it was expressly stated and understood as between the parties that 'termination' under the Retainer Agreement would only be termination of the Retainment Agreement, not termination of Brodock's employment itself with Nevro," Compl. ¶ 29, that "Brodock … understood that terminating the Retainment Agreement would only mean that the employment relationship reverted to the pre-Retainment terms of his employment," Compl. ¶ 46, and that "[o]nce Brodock had verbally agreed that he understood that the Retainment Agreement had been terminated by Nevro, Nevro then incredibly announced that it was also going to terminate the original employment agreement under which Brodock was initially hired," Compl. ¶ 47.

The Amendment, however, contains none of these terms and contains an integration clause:

> The Offer Letter Agreement, as amended by this Amendment (the "Amended Offer Letter Agreement"), together with your Proprietary Information and Inventions Agreement, forms the complete and exclusive agreement regarding the subject matter hereof and

supersedes any other agreements or promises by anyone, whether oral or written.  Modifications or amendments to the Amended Offer Letter Agreement, other than those changes expressly reserved to the Company's discretion, must be made in a written agreement signed by you and a duly authorized officer of NEVRO.

Determann Decl. Ex. C at 3.

## IV.   Plaintiff Alleges He Was Terminated for Failing to Meet His Quotas

Plaintiff alleges that the basis for his termination was failing to meet his quota for two consecutive quarters, that is, under subsection (vi).  *See* Compl. ¶ 44. He asserts that he achieved 85% of his quota in the third quarter of 2019 and that he "may have also met the quota for the final quarter, though he is unsure." Compl. ¶ 40.  He alleges repeatedly that the quotas were "unreasonably high." Compl. ¶¶ 33, 40.  He identifies a series of excuses for why the quotas were supposedly too high, including complaints about nursing support, saturation of the market, and pretext because "a new owner had taken over and was looking for ways to cut costs."  Compl. ¶¶ 33-49.

## V.   After Plaintiff's Termination, Nevro Told Plaintiff It Would Not Enforce His Non-Compete[3]

In addition to the 2016 Agreement and Amendment discussed in the Complaint, Plaintiff also signed a Proprietary Information and Inventions

---

[3] The Court can consider the facts in this section in connection with Plaintiff's Rule 12(b)(1) motion to dismiss Count VI for lack of subject matter jurisdiction.  *See Cramer v. John Alden Life Ins. Co.*, 763 F. Supp. 2d 1196, 1203 (D. Mont. 2011).

Agreement (the "PIIA") upon hiring.  Determann Decl. Ex. B.  The PIIA included

the following terms:

> 1.1    I will observe complete confidentiality with respect to, and not disclose, Proprietary Information without the prior written permission of the Company, and will not use any Proprietary Information except as required to perform my job duties for the Company. I will not sell, license, disclose or otherwise exploit any Proprietary Information except as required by law or with the prior written permission of the Company. "Proprietary Information" includes, but is not limited to (and, for the sake of clarity, includes Inventions, as defined below), any information relating or belonging to customers, customer lists or requirements, price lists or pricing structures, marketing and sales information, business plans or dealings, employees or officers, financial information and plans, designs, formulae, product lines, prototypes, services, research and development activities, source codes and computer systems, software, any document marked "Confidential" (or with a similar expression), or any information which I have been told is confidential or which I should reasonably expect would be regarded as confidential by the Company, its customers, suppliers, employees and other persons.

> ….

> **3.     NON-SOLICITATION**

> I agree that during the term of my relationship with the Company, and for a period of twelve (12) months (or the maximum period permitted by law, whichever is shorter) immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity. Further, during my relationship with the Company and at any time following termination of my relationship with the Company for any reason, with or without cause, I shall not use any Proprietary Information of the Company to attempt to negatively

influence any of the Company's clients or customers from purchasing
Company products or services or to solicit or influence or attempt to
influence any client, customer or other person either directly or
indirectly, to direct his or its purchase of products and/or services to
any person, firm, corporation, institution or other entity in competition
with the business of the Company.

Determann Decl. Ex. B at 1, 3.

Plaintiff was notified he was being discharged on December 30, 2019. *See*
Compl. ¶ 47. Shortly thereafter, Nevro became aware of emails Plaintiff sent from
his Nevro email account to his professional contacts, including Montana doctors
with whom he had worked while employed by Nevro, announcing his departure.
Determann Decl. ¶ 8. In Nevro's view, these communications revealed Nevro's
confidential information. Determann Decl. ¶ 8. Nevro contacted Plaintiff on
January 17 and instructed him to "cease and desist from any further contact with
Nevro customers or sharing Nevro confidential information outside the company."
Determann Decl. Ex. E.

On January 23, Plaintiff emailed a host of Nevro executives complaining
about his discharge and asking to be relieved of his non-competition agreement.
Determann Decl. Ex. F. Among other things, Plaintiff wrote: "I acknowledge I
fell short in quota the last 2 quarters" and "I would ask you to relieve me of a non
compete so I can work and provide for my family." *Id.*

The week of January 27, Plaintiff spoke on the phone with an in-house
attorney at Nevro, Kathleen Determann. Determann Decl. ¶ 12. In the call,

Determann explained that Nevro's projected and actual revenue figures and the performance results of other employees are confidential and that sharing that information is a violation of Brodock's various contractual obligations to Nevro. Determann Decl. ¶ 12. Determann confirmed the substance of the call in writing on January 31, including that Plaintiff agreed that he would "cease sharing any confidential business information with Nevro customers or initiating contact to discuss the terms of [his] termination/seek assistance with [his] future employment efforts." Determann Decl. Ex. G. Plaintiff also agreed that he would "sign and return [his] Separation Agreement and abide by its terms, including non-disparagement and not disclosing Nevro confidential business information." *Id.*

The proposed Separation Agreement included the following terms:

6.      <u>Acknowledgment of Your Continuing Obligations to the Company</u>.  In conjunction with your employment by the Company, you executed the Employee Proprietary Information and Inventions Agreement attached as <u>Exhibit B</u> hereto (the "<u>Confidentiality Agreement</u>") and an Offer Letter (which sets forth, among other things, your noncompete restrictions to the Company, the "<u>Offer Letter</u>").  You acknowledge and agree to comply with all continuing obligations under the Offer Letter and Confidentiality Agreement, including but not limited to your noncompetition obligations and your obligations with respect to Proprietary Information, Company Inventions, to return Company documents, and not to solicit or attempt to solicit any employee, consultant or independent contractor of the Company…..

….

11.     <u>Non-Disparagement</u>.  You agree not to disparage or defame the Company, its directors, officers and employees, Company products or

services, or any Releasee, publicly or privately, directly or indirectly
through others, by use of any words, actions, gestures or medium,
including but not limited to on social media or other internet site.  The
Company agrees to instruct its senior executive officers not to
disparage or defame you, publicly or privately, directly or indirectly
through others, by use of any words, actions, gestures or medium,
including but not limited to on social media or other internet site.....

Determann Decl. Ex. D.  Plaintiff never returned a signed copy of the Separation

Agreement.  Determann Decl. ¶ 9.

In their phone call, Determann told Plaintiff that Nevro agreed not to enforce

the non-compete or otherwise limit his ability to seek employment with another

company in his area.  Determann Decl. ¶ 12.  Determann also confirmed this

portion of the call in her January 31 email.  Determann Decl. Ex. G.  Determann

has not had any further communications with Plaintiff regarding his non-compete,

the Separation Agreement, or his potential employers since this January 31 email.

*See* Determann Decl. ¶ 15.  She is not aware of Brodock contacting anyone else at

Nevro about these topics.  Determann Decl. ¶ 15.

Plaintiff filed this action on June 17, 2020 in the Montana Thirteenth

Judicial District Court.  Nevro removed the action to this Court on July 22.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, allegations in a pleading must

contain sufficient facts beyond mere conclusory statements.  The standard of

review under Rule 12(b)(6) is informed by the provision of Fed. R. Civ. P. 8(a)(2)

which requires that a pleading "must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009) (quoting Rule 8).  Although Rule 8(a)(2) does not require "detailed factual allegations," a plaintiff must set forth more than bare allegations that the defendant unlawfully harmed the plaintiff.  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

For purposes of Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The factual allegations must "show[] that the pleader is entitled to relief[.]"  *Id.* at 679 (quoting Rule 8(a)(2)).

Although "[a]s a general rule, a court may not consider material beyond the complaint in ruling on [a] Fed. R. Civ. P. 12(b)(6) motion, … the court may consider evidence on which the complaint necessarily relies if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Jonas v. Lake Cty. Leader*, 953 F. Supp. 2d 1117, 1123 (D. Mont. 2013) (citing *Intri–Plex Technologies v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007);

*Daniels–Hall v. National Education Assoc.*, 629 F.3d 992, 998 (9th Cir. 2010) (quotation marks omitted)).

The requirement that this Court accept Plaintiff's factual allegations as true for purposes of resolving a Rule 12(b)(6) motion to dismiss does not extend to legal conclusions and allegations contradicted by documents that are referenced in the Complaint. *See Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015).

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) asserts that the Court lacks subject matter jurisdiction over some part of the case, such as a portion of the complaint seeking a declaratory judgment in the absence of an actual case or controversy. *See Montanans for Cmty. Dev. v. Motl*, No. CV 13-70-H-CCL, 2014 WL 977999, at *1 (D. Mont. Mar. 12, 2014). When the movant challenges the factual allegations upon which jurisdiction is based, "the court 'may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.'" *Cramer v. John Alden Life Ins. Co.*, 763 F. Supp. 2d 1196, 1203 (D. Mont. 2011).

## ARGUMENT

### I.   Plaintiff's WDEA Claim Should Be Dismissed Because He Was Covered by a Written Contract of Employment for a Specific Term.

Mont. Code Ann. § 39-2-912(2) provides that the Wrongful Discharge from Employment Act "does not apply to a discharge … of an employee covered by a

written collective bargaining agreement or a written contract of employment for a specific term."  "If an employment contract for a specific term also allows the employer to terminate at will … it is not a 'written contract for a specific term' under that statute."  *Brown v. Yellowstone Club Operations, LLC*, 255 P.3d 205, 208 (Mont. 2011).  In all other cases, WDEA claims are properly dismissed when the employee is covered by a written CBA or contract for specific term.  *See Winslow v. Montana Rail Link, Inc.*, 16 P.3d 992, 996 (Mont. 2000); *Farris v. Hutchinson*, 838 P.2d 374, 378 (Mont. 1992).

Plaintiff's employment at Nevro was covered by the 2016 Agreement, as modified by the Amendment.  Determann Decl. Exs. A, C.  The amended agreement provided that Plaintiff would "be employed by NEVRO for a fixed term commencing on [December 14, 2018] and continuing until December 31, 2020."  Ex. C at 1.  The Amendment made clear that "this modifies your prior at-will employment status such that your employment during the Term is not at-will."  *Id.*

Plaintiff alleges at various points in the Complaint that the Amendment was a separate agreement (which he calls the "Retainer Agreement" or "Retainment Agreement") such that termination of the Amendment would not result in termination of the 2016 Agreement.  Compl. ¶¶ 29, 46-47.  But the Court should not treat these allegations as true for purposes of resolving this motion because they are contradicted by the documents.  *See Johnson.*, 793 F.3d at 1008; *Christian*

14

*Legal Soc. v. Eck*, 625 F. Supp. 2d 1026, 1037 (D. Mont. 2009) ("The court need not accept as true [any] allegations contradicting documents that are referenced in the complaint." (quotation marks omitted)).  The plain language of the documents shows that Plaintiff's employment was covered by a single agreement—the 2016 Agreement as modified by the Amendment—meaning termination of that agreement was termination of Plaintiff's employment.  The Court can make this determination despite any contradicting allegations in the Complaint, *see id.*, and because interpretation of these contracts is a question of law, *see Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 586 (Mont. 2018).

The amended agreement provided that Plaintiff "will be employed by NEVRO for a fixed term" and that "NEVRO shall have the discretion to terminate or modify this Agreement during the Term for Cause."  Determann Decl. Ex. C at 1-2.  "Cause" includes "consistent failure to demonstrate adequate performance of your sales-related duties, as evidenced by two consecutive quarters during the Term of failure to meet 70% of your sales quota under the Plans."  *Id.* at 3.  The amended agreement also stated that "[i]f, during the Term … NEVRO terminates your employment without Cause, such termination will be deemed a material breach of this Amendment."  *Id.* at 2.  As such, the amendment agreement does not suggest that Plaintiff's employment was at-will, instead of for a term.

Plaintiff's employment at Nevro was "covered by a written contract of employment for a specific term" and the WDEA "does not apply to [his] discharge." *See* Mont. Code Ann. § 39-2-912(2); *Brown*, 255 P.3d at 208. Accordingly, the Court should thus dismiss Count I of his complaint.

## II.  Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed Because the Express Provisions of His Employment Agreement Govern His Grievances

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because Nevro's alleged breach is governed by the express terms of Plaintiff's 2016 Agreement, as modified by the Amendment. Plaintiff asserts that Nevro breached the implied covenant "by setting unreasonable quotas, failing to give Brodock the requisite notice of an alleged cause for termination, and failing to give Brodock an opportunity to cure the alleged deficiencies." Compl. ¶ 68. "[U]nder Montana law, implied contractual provisions will not be applied where, as here, express provisions govern." *Tvedt v. Farmers Ins. Grp. of Companies*, 91 P.3d 1, 8 (Mont. 2004).

Brodock's alleged violations of the implied covenant, if true, constitute alleged violations of the express terms of the amended agreement. The amended agreement permitted NEVRO to terminate Plaintiff for "(vi) consistent failure to demonstrate adequate performance of your sales-related duties, as evidenced by two consecutive quarters during the Term of failure to meet 70% of your sales

quota under the Plans." Determann Decl. Ex. C at 2. The sales quota was one of Plaintiff's "defined performance goals, as reasonably determined by NEVRO management…." Determann Decl. Ex. A at 1. Plaintiff's claim that the sales quotas were unreasonable directly implicates this contractual language, precluding an implied covenant claim. *See Farris v. Hutchinson*, 838 P.2d 374, 377 (Mont. 1992) (affirming Rule 12 dismissal of implied covenant claim by former employee because her termination was governed by express terms of contract).

Plaintiff's allegation that Nevro breached the implied covenant by not giving Plaintiff notice and an opportunity to cure should be dismissed because the amended agreement's express terms did not require notice and opportunity to cure. Plaintiff was terminated for violating clause (vi) in the definition of "Cause," quoted above. The definition of "Cause" states that "a breach, neglect, or nonperformance as set forth in **clauses (iii), (iv), or (v)** shall constitute Cause only if it is not cured to the reasonable satisfaction of NEVRO within 30 days following NEVRO's written notice to you of such breach, neglect, or nonperformance." Determann Decl. Ex. C at 2 (emphasis added). The definition of "Cause" obligated Nevro to provide an opportunity to cure with regard to subsections (iii)-(v), and it gave Nevro the right to terminate without providing an opportunity to cure with regard to subsection (vi). Plaintiff cannot invoke the implied covenant to erase that right. *See* Compl. ¶ 68; *Farris*, 838 P.2d at 377 ("No obligation can be

17

implied which would result in the obliteration of a right expressly given under a written contract.").  The Court should dismiss Count III.

## III.   Plaintiff's Tortious Interference Claim Should Be Dismissed Because Nevro Had a Legal Right to Tell Plaintiff to Follow His Agreements

Plaintiff's Complaint does not plausibly allege that Nevro tortiously interfered with Plaintiff's prospective economic advantage.  Stripped of legal conclusions, two allegations[4] in the complaint relate to Plaintiff's tortious interference claim:

- "Nevro has attempted to enforce a non-compete requirement precluding Brodock from working for Nevro competitors."  Compl. ¶ 53.

- "[E]ven though Brodock was given 'lack of revenue' as the reason for his termination, when Brodock has attempted to explain to potential employers why he was terminated, Nevro has threatened Brodock that he is in violation of a non-disparagement provision."  Compl. ¶ 54; *see also id.* ¶ 85 (rephrasing same allegation).

Plaintiff does not allege Nevro ever contacted a third-party, such as a potential employer for Plaintiff, to assert Nevro's contractual rights.  Plaintiff's theory appears to be that if Nevro told him it expected him to comply with his contractual obligations to Nevro, Nevro can be liable for tortious interference.  This is not the law.

---

[4] As with most of the Complaint, Nevro denies these allegations but assumes they are true for purposes of this motion only.

"To state a claim for intentional interference with prospective economic advantage, a plaintiff must adequately plead that the defendant's acts: '(1) are intentional and willful; (2) are calculated to cause damage to the plaintiff's business; (3) are done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) result in actual damages or loss.'" *Peterman v. Republican Nat'l Comm.*, 320 F. Supp. 3d 1151, 1161 (D. Mont. 2018); *see also Wingfield v. Dep't of Pub. Health & Human Servs.*, 463 P.3d 452, 454 (Mont. 2020). "Montana law provides that action taken in the good faith belief that it is performed with right and justifiable cause cannot serve as the basis for a tortious interference claim, even if it turns out that, in fact, the action is not legally justified." *Rocky Mountain Biologicals, Inc. v. Microbix Biosystems, Inc.*, 986 F. Supp. 2d 1187, 1200 (D. Mont. 2013).

Montana courts consistently hold that a party cannot be liable for intentional interference by exercising its legal rights. In *Wingfield v. Dep't of Pub. Health & Human Servs.*, residents of an assisted living facility were relocated when the facility encountered licensing issues. 463 P.3d at 453. After the issues were resolved, some of the residents wanted to return, but their legal guardians refused to return them. *Id.* The facility claimed the guardians' refusal amounted to "intentional interference." *Id.* The court affirmed judgment on the pleadings against the facility, concluding that the "guardians had the right to act as they did,

[so] their conduct does not amount to intentional interference with prospective economic advantage or tortious or intentional interference with contractual relations." *Id.* at 454.

This "legal right" bar to an intentional interference claim is well established in Montana.  In *Ruff*, the court affirmed summary judgment against a tortious interference claim when the alleged tortfeasor "acted lawfully within its contract rights."  424 P.3d at 596.  In *Pospisil v. First Nat'l Bank of Lewistown*, the court held legal acts could not give rise to a presumption or inference of intent to harm the plaintiff, as is required to support an interference claim.  37 P.3d at 708-09. The court explained why in *Taylor v. Anaconda Fed. Credit Union*:

> The action of interference with contract rights is a tort action, tort meaning wrongful or unlawful or without justification. The element of malice (not malice as it is understood in the popular sense of spite or ill will, but malice in the legal sense) meaning the intentional doing of a wrongful act without justification or excuse, is an essential element of an action for interference with contract.  Such malice is not presumed and cannot be inferred from the commission of a lawful act.

550 P.2d 151, 154 (Mont. 1976); *see also Boyd v. Keystone Const.*, No. 1:14-CV-119-WTL-MJD, 2015 WL 4427630, at *7 (S.D. Ind. July 20, 2015) (dismissing former employee's claim for tortious interference with prospective economic relations because her complaint did not "suggest that [the former employer] took any action to enforce the non-compete agreement that interfered with any employment relationship that [the former employee] had").

Here, the Court should hold that Plaintiff has not plausibly alleged that Nevro did not have a legal right to tell Plaintiff to abide by his contract with Nevro. Acting to protect one's own contract is not tortious interference. *Rocky Mountain Biologicals*, 986 F. Supp. 2d at 1200; *Quinlivan v. Brown Oil Co.*, 29 P.2d 374, 377 (Mont. 1934) ("Absolute rights [include . . .] rights growing out of contractual relations, [and …t]hese rights the individual may exercise without reference to his motive as to any injury directly resulting therefrom, since the courts, apparently on the ground of expediency, have consistently held that such injury is not a legal injury in the sense that it is actionable."). There are insufficient allegations to plausibly plead that Nevro did not have a legal right to tell Plaintiff (and, as alleged, no one else) to follow the parties' alleged agreement not to compete with or disparage Nevro.

## IV.   Plaintiff's Infliction of Emotional Distress Claim Should Be Dismissed Because His Allegations of Distress are Insufficiently Severe

"Under Montana law, a plaintiff's independent or 'stand alone' claim for intentional or negligent infliction of emotional distress can be maintained only upon a showing the plaintiff suffered 'serious' or 'severe' emotional distress as the reasonably foreseeable consequence of the defendant's act or omission." *Puryer v. HSBC Bank USA, Nat'l Ass'n*, 419 P.3d 105, 115 (Mont. 2018) (citing *Sacco v. High Country Indep. Press*, 896 P.2d 411 (Mont. 1995)). "To constitute 'serious' or 'severe,' the emotional distress must be 'so severe that no reasonable person

could be expected to endure it.'" *Id.* Additionally, absent "actual physical injury," in a breach of contract action, "recovery is prohibited for emotional or mental distress." Mont. Code Ann. § 27-1-310; *see also Warrington v. Great Falls Clinic, LLP*, 443 P.3d 369, 376 (Mont. 2019). Plaintiff does not allege physical injury, so his emotional distress claim cannot be premised on his discharge in alleged violation of his employment agreement. *See* Compl. ¶ 92 (claiming breach of the employment agreement supports the emotional distress claim).

Plaintiff's allegations are not pled with sufficient factual details to plausibly reach the level of severity required to maintain an independent claim for infliction of emotional distress, that is, distress "so severe that no reasonable person could be expected to endure it," as is required to support an independent claim for infliction of emotional distress. *See Puryer*, 419 P.3d at 115. Plaintiff's description of his emotional distress is (in full): "mental and emotional distress manifesting in physical symptoms of stress and anxiety," Compl. ¶ 57, and "financial damages as well as extreme emotional distress, manifesting physically, to Brodock and his family, whose housing, health care and sustenance have been placed at risk." Compl. ¶ 95. These allegations are similar to those the court in *Puryer* held were insufficient to state a claim—that a lender's "actions of foreclosing on plaintiff's property have caused Plaintiff to live in fear and suffer serious or severe emotional distress to the extent that it has affected Plaintiff's health." 419 P.3d at 115.

Even if Plaintiff's allegations as severity were sufficient, he also has not plausibly alleged that it should have been reasonably foreseeable to Nevro that terminating Plaintiff's employment would cause him distress of the required level of severity.  *See Sacco*, 896 P.2d at 426*; see also Green v. Eagle Bank*, No. CV 13-159-M-DWM-JCL, 2013 U.S. Dist. LEXIS 171145, at *29 (D. Mont. Nov. 7, 2013) (dismissing infliction of emotional distress claim under Rule 12).  A finding to the contrary would lead to the result that any employee discharged from employee who alleges "stress and anxiety" as a result could state a claim for infliction of emotional distress.  This is not the law.  Count V should be dismissed.

**V.      Plaintiff's Declaratory Judgment Claim Should Be Dismissed because there is No Case or Controversy About Plaintiff's Non-Compete or a Non-Disparagement Agreement**

Plaintiff's Count VI asserts that "[d]isputes currently exist between Brodock and Nevro concerning their respective obligations under the agreements they entered into in connection with Brodock's employment."  Compl. ¶ 97.  None of the alleged controversies is sufficient to support a declaratory judgment action.

"Under the Declaratory Judgment Act, 28 U.S.C. § 2201,[5] a plaintiff must

---

[5] Although Plaintiff's complaint cites Montana's Declaratory Judgment Act, after removal to this Court, the Federal Declaratory Judgment Act applies.  *Hart v. PacificSource Health Plans*, No. CV 18-56-BU-BMM-JCL, 2019 WL 4044050, at *2 (D. Mont. June 18, 2019), *report and recommendation adopted*, No. CV-18-56-BU-BMM-JCL, 2019 WL 3244634 (D. Mont. July 19, 2019).

establish standing by showing 'that there is a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment.'" *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 658 (9th Cir. 2002). The Act requires the existence of a case or controversy between the parties at the time the suit is filed and for the duration of the suit. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1556 n.22 (9th Cir. 1989). A claim under the Act is appropriately dismissed pursuant to Fed. R. Civ. P. 12(b)(1) when the claim fails to demonstrate the existence of a case or controversy between the parties. *See Montanans for Cmty. Dev. v. Motl*, No. CV 13-70-H-CCL, 2014 WL 977999, at *1 (D. Mont. Mar. 12, 2014).

The alleged controversy in Paragraph 98 and part of Paragraph 102—that Nevro was required to set reasonable quotas and give Plaintiff notice and an opportunity to cure—is merely a restatement of Plaintiff's breach of contract theory and so should be dismissed as duplicative. *See United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*, 145 F. Supp. 3d 932, 961 (C.D. Cal. 2015) (dismissing declaratory judgment count as duplicative of breach claim).

Paragraph 99 alleges that "Nevro has asserted that it is entitled to enforce non-compete and non-disparagement agreements against Brodock," and goes on to state that Plaintiff believes these agreements are not enforceable. Paragraph 102

24

also requests a declaration "that Brodock is not subject to any non-compete or non-disparagement obligations to Nevro."  Neither presents a live controversy.

Plaintiff's request as to "any non-compete" is not a live controversy because Nevro's in-house attorney told Plaintiff in January—on the phone and in writing—that "Nevro agreed not to enforce the non-compete or otherwise limit his ability to seek employment with another company in his area" and that "Nevro agreed that it will not enforce the non-competition provision of [his] Offer Letter."  Determann Decl. ¶ 12 & Ex. G.  This Court does not have jurisdiction over a Declaratory Judgment Act claim to evaluate the enforceability of a non-competition agreement that the employer has said it will not enforce.  *See Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017, 1028 (C.D. Cal. 2012); *Howard v. Octagon, Inc.*, No. C 13-1111 PJH, 2013 WL 5122191, at *4 (N.D. Cal. Sept. 13, 2013).  Nevro told Plaintiff six months ago that it would not enforce his non-competition agreement.  There is no case or controversy for the Court to resolve and Plaintiff's request for a declaratory judgment as to the agreement's enforceability should be dismissed.

Plaintiff also alleges insufficient facts to suggest there is a case or controversy as to the "non-disparagement" provision.  This provision appears in the Separation Agreement, which Plaintiff never signed.  Determann Decl. ¶ 9.  Plaintiff asserts that "even though [he] was given 'lack of revenue' as the reason

for his termination, when Brodock has attempted to explain to potential employers why he was terminated, Nevro has [threatened] Brodock that he is in violation of a non-disparagement provision." Compl. ¶ 54. He also claims "Nevro cannot invoke the alleged … non-disparagement requirement[] to prevent Brodock from explaining the nature of his separation from Nevro." Compl. ¶ 55.

Although Nevro told Plaintiff on January 17 to "cease and desist from any further contact with Nevro customers or sharing Nevro confidential information outside the company," and referenced a non-disparagement obligation, that email was before Plaintiff spoke with Nevro's in-house counsel the week of January 27 and agreed to "cease sharing any confidential business information with Nevro customers or initiating contact to discuss the terms of [his] termination/seek assistance with [his] future employment efforts." Determann Decl. Ex. G. Nevro did not have any further communications with Plaintiff about his non-compete, the Separation Agreement, or his potential employers after this January 31 email. Determann Decl. ¶ 15.

Plaintiff is free to communicate with potential employers so long as he refrains from revealing Nevro's confidential information. Plaintiff does not identify a single potential employer with which he has communicated or wishes to communicate. Plaintiff's desire for the Court to adjudicate what he can and cannot

say to unidentified potential employers is precisely the sort of hypothetical dispute that does not present a case or controversy vesting this Court with jurisdiction.

## **<u>CONCLUSION</u>**

The Court should dismiss Counts I and III – VI of Plaintiff's Complaint.

DATED this 31st day of July, 2020.

DORSEY & WHITNEY LLP


*/s/ Ben D. Kappelman*
Ben D. Kappelman
Briana Al Taqatqa
kappelman.ben@dorsey.com
altaqatqa.briana@dorsey.com
Millennium Building
125 Bank Street, Suite 600
Missoula, MT 59802-4407
Telephone:  (406) 721-6025


*Attorneys for Defendant Nevro Corp.*

## CERTIFICATE OF COMPLIANCE

I, Ben Kappelman, certify that Defendant's Brief in Support of its Motion to Dismiss complies with Local Rule 7.1(d)(2) and that, in preparation of this brief, I used Microsoft Word 2016, and that the word-count function of this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.  I further certify that I commissioned a word count check and received the report that the above-referenced brief contains 6,463 words.  I further certify that the above-referenced brief complies with the type-size requirements of Local Rule 1.5(a) because it has been prepared using 14-point Times New Roman type.

DATED this 31st day of July, 2020.

*/s/ Ben D. Kappelman*
Ben D. Kappelman