IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KEVIN BRODOCK,<br><br>                     Plaintiff,<br><br>vs.<br><br>NEVRO CORP., a Delaware<br>Corporation,<br><br>                     Defendant. | CV 20-110-BLG-SPW-TJC<br><br>**FINDINGS AND<br>RECOMMENDATIONS OF<br>UNITED STATES<br>MAGISTRATE JUDGE** |

Plaintiff Kevin Brodock ("Brodock") brings this action against Defendant Nevro Corp ("Nevro"), alleging wrongful termination of employment.  (Doc. 6.)

Presently before the Court are Nevro's Motion for Summary Judgment (Doc. 72) and Brodock's Motion for Partial Summary Judgment (Doc. 66), which have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B).  The motions are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court **RECOMMENDS** Nevro's motion be **GRANTED in part and DENIED in part**, and Brodock's motion be **DENIED**.

## I.    BACKGROUND[1]

Nevro is a medical device company that manufactures and sells implantable products that are used for treating chronic pain.  Nevro has approximately 400 sales employees throughout the United States who market its devices to hospitals and doctors.

On September 7, 2016, Nevro made an offer of employment to Brodock. Brodock accepted the offer, and executed an Offer Letter Agreement dated September 9, 2016 ("2016 Agreement"), which governed the terms of his employment.  Under the 2016 Agreement, Brodock received a base annual salary of $60,000 and was eligible for up to $180,000 in bonuses.  The 2016 Agreement provided that bonuses were determined based on Brodock's "achievement of defined performance goals, as reasonably determined by Nevro management." The "defined performance goals" included sales quotas.  The 2016 Agreement also stated that Brodock's employment was "at will," and Nevro had the right to terminate his employment "with or without cause at any time."

The 2016 Agreement contained a provision stating that for a period of one year following termination of employment, Brodock would not "within any state in the United States in which you performed your work for the Company, directly or

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

indirectly enter into or engage in a business similar to that of the [sic] Nevro or

otherwise in competition with the business of Nevro, whether as an owner, partner,

joint venturer, employee, consultant, agent, officer, director, or in [sic] other

capacity whatsoever."

Brodock also signed a Proprietary Information and Inventions Agreement

(the "PIIA") on September 9, 2016.  Brodock understood that by signing the PIIA,

he had an obligation to keep proprietary information confidential and not to use

proprietary information to attempt to negatively influence Nevro's customers from

using Nevro's products or services.

Brodock was hired as District Sales Manager I.  His responsibilities included

achieving sales targets and managing his own territory.  In addition to sales duties,

Brodock was responsible for physician and patient education and support,

responding to patient concerns in person and telephonically, reprogramming

devices, and assisting physicians with "trial" and "permanent" implantation

procedures.

Nevro also employs therapy support teams to assist its sales force by

providing additional clinical support for physicians and patients.  The therapy

support teams include Therapy Consultants and Therapy Support Specialists.

Brodock was responsible for leading the day-to-day activities of the clinical

support specialists in his territory.  Nevro hired Gina Frank as a Therapy

Consultant in December 2016, and she worked with Brodock until July 2019, when she transferred to Nevro's western Montana territory.  Nevro hired Anita Copp to replace Frank in Brodock's territory on July 8, 2019.

When Brodock was hired, his sales territory included Casper, Wyoming, north Wyoming and the central corridor of Montana, including the city of Billings. In early 2019, Wyoming was transferred to another District Sales Manager's territory.  Thereafter, Brodock's territory included only central Montana.

Sales quotas are the performance goals for Nevro's sales force.  Nevro's sales leadership team, including the U.S. Vice President of sales, Area Vice Presidents ("AVPs"), and Regional Sales Directors ("RSDs") are responsible for setting the company's sales quotas.  Nevro first assigns sales quotas to each area, then each area's quota is divided into smaller regions.  Finally, regional sales quotas are divided among the District Sales Managers ("DSMs") within the region, resulting in each DSM being assigned a sales quota for their territory.  After sales quotas have been set, they are not adjusted during the quota period to account for common market fluctuations, such as a doctor opening a new practice or retiring.

In 2017 and 2018, Brodock typically exceeded 100% of his sales quotas each quarter.  At the end of 2018, Brodock was ranked 6th out of approximately 200 sales representatives for sales performance based on percentage quota attainment.  Brodock's 2018 performance qualified him for the "President's Club,"

4

and he was awarded a trip to Hawaii.  In recognition of his performance, Brodock was promoted to District Sales Manager II, and his annual base salary increased as well as his cash bonus target.

In December 2018, Nevro offered Brodock a retention agreement as an incentive for him to stay with the company.  Brodock signed the agreement on December 14, 2018 ("2018 Amendment").

The 2018 Amendment provided that Brodock would "be employed by NEVRO for a fixed term commencing on the Effective Date and continuing until December 21, 2020 (the 'Term'), subject to the conditions herein."  The 2018 Amendment also modified Brodock's prior at will status, and stated that his employment during the Term was "not at will."  It further stated that if Brodock's "employment by NEVRO continues beyond the Term and the parties have not entered into a written agreement extending the Term, your continued employment beyond the expiration of the Term will be at-will."

Under the 2018 Amendment, Brodock's annual base salary remained unchanged, but the terms of his bonus compensation changed.  Nevro guaranteed Brodock's base salary plus 85% of his "target bonus as a minimum for each quarter during the Term in which you meet 70% of your sales quotas as defined in the Plans."  Under the 2018 Amendment, Brodock could earn $32,250 more in 2019 for achieving the same percentage quota attainment than he could have

5

earned under the 2016 agreement.  He was also entitled to $25,000 in additional incentive compensation if he exceeded 100% of his annual sales quota.

The 2018 Amendment further provided Nevro had "the discretion to terminate or modify this Agreement during the Term for Cause," and Brodock had the right to terminate his "employment or this agreement during the Term for Good Reason."  Under the 2018 Amendment, "Cause" included "consistent failure to demonstrate adequate performance of your sales-related duties, as evidenced by two consecutive quarters during the Term of failure to meet 70% of your sales quota under the Plans."

In 2019, Brodock attained 105.1% of his first quarter quota and 134.9% of his second quarter quota.  In the third quarter of 2019, however, Brodock attained only 60.8% of his sales quota, and only 60.3% in the fourth quarter.

In December 2019, Nevro notified Brodock that it was terminating his employment for failure to meet 70% of his sales quotas for the last two quarters of 2019, and that his last day as an employee would be January 15, 2020.  Brodock alleges that Nevro set his quota's unreasonably high, and that Nevro's reason for terminating his employment was pretextual.

Nevro offered Brodock a Separation Agreement that would have given Brodock a $5,384.00 severance payment in exchange for a release of all known and unknown claims against Nevro.  The Separation Agreement also contained a

non-disparagement provision, under which Brodock would have agreed not to disparage or defame Nevro publicly or privately.  Brodock had until February 5, 2020 to sign and return the Separation Agreement.  Brodock never signed the Separation Agreement.

On December 30 and 31, 2019, after Brodock was informed of his termination, and while he was still employed by Nevro, Brodock sent emails to several of Nevro's customers informing them of his termination.  Brodock stated, "Unfortunately, I was let go from Nevro today.  The reason given was 'I was not bringing in enough revenue, Nevro numbers were going up and mine were flat or going down.'  I guess revenue wins over patient satisfaction."  Brodock also indicated he did not know who would be responsible for patient coverage in his absence, but stated he would "help with all of your patients as much as Nevro will allow me."  Brodock told providers located in Great Falls and Helena that he didn't know what would happen there because "someone will have to be in Billings 3-4 days a week to handle the surgery case load and patient clinic days."  Whereas he told providers in Billings that he didn't know "what will happen in Billings in regards to surgery and re-programming days."  Brodock told one provider that "Nevro did cut around 35-40 reps last month, maybe there is something within Nevro I don't know about??"

Nevro believed Brodock's email communications constituted a violation of his obligation to keep certain information confidential, and were intended to raise doubts among Nevro's customers about Nevro's ability to service their patient's needs.  Brodock asserts Nevro's beliefs were objectively unreasonable, and that the communications were neither disparaging nor confidential.

On January 17, 2020, Nevro contacted Brodock and instructed him to "cease and desist from any further contact with Nevro customers or sharing Nevro confidential information outside the company."  Nevro stated that Brodock's contacts with its customers was "in violation of your Separation Agreement dated December 30, 2020" and the PIIA.

On January 23, 2020, Brodock emailed several Nevro executives about his termination.  Among other things, Brodock wrote "I acknowledge I fell short in quota the last 2 quarters," and "I would ask you to relieve me of a non compete so I can work and provide for my family."

During the week of January 27, 2020, Brodock had a telephone conversation with Nevro's Associate General Counsel, Kathleen Determann.  Following the telephone call, Ms. Determann sent Brodock an email on January 31, 2020, summarizing their conversation as follows: "You agreed that you would: (1) cease sharing any confidential business information with Nevro customers or initiating contact to discuss the terms of your termination/seek assistance with your future

employment efforts; . . . and (3) you will sign and return your Separation Agreement and abide by its terms, including non-disparagement and not disclosing Nevro confidential business information.  With respect to this last item, Nevro has agreed that it will not enforce the non-competition provision of your Offer Letter." Brodock did not respond to the January 31, 2020 email, and had no further contact with Nevro regarding the non-compete provision, the Separation Agreement, or his potential employers.

On June 17, 2020, Brodock filed the instant action against Nevro.  Brodock alleged claims for (1) wrongful discharge from employment; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) tortious interference with economic opportunity; (5) infliction of emotional distress; and (6) declaratory relief.

The Court subsequently dismissed Brodock's claim for wrongful discharge. (Docs. 23, 26.)  The Court also dismissed the portion of Brodock's claim for declaratory relief, in which he sought a declaration that "Nevro violated its express and/or implied obligations to Brodock by setting unreasonable quotas, failing to give Brodock the requisite notice of an alleged cause for termination, and failing to give Brodock an opportunity to cure the alleged deficiencies[.]"  (*Id.*)

On April 8, 2021, Nevro filed an answer to Brodock's complaint and asserted counter claims for breach of contract and breach of the duty of loyalty

based on Brodock's email communications with Nevro's customers following his termination.  (Doc. 28.)

Nevro now moves for summary judgment in its favor as to all remaining claims in Brodock's complaint (Doc. 72), and Brodock moves for partial summary judgment in his favor on Nevro's counterclaims (Doc. 66).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

/ / /

/ / /

/ / /

10

## III.   NEVRO'S MOTION FOR SUMMARY JUDGMENT

### A.   Count II – Breach of Contract

Brodock alleges Nevro breached the employment contract by setting unreasonable quotas, and by failing to give him notice of and an opportunity to cure his performance deficiencies.  (Doc. 6. at ¶ 68.)  Nevro moves for summary judgment, arguing Brodock cannot meet his burden to prove a breach under either theory.  Nevro contends there is no evidence that it set unreasonable quotas, and that Brodock's 2019 quotas were objectively reasonable.  Nevro further contends Brodock was not entitled to notice and an opportunity to cure under the express terms of the 2018 Amendment.

   a.   Quotas

It is undisputed that under Brodock's contract with Nevro, his quotas were to be "reasonably determined by Nevro management."  (Doc. 75-6 at 2.)  Whether Nevro breached the contract, therefore, depends on whether Nevro set reasonable quotas.

Generally, reasonableness is a question of fact for the jury unless "the undisputed facts leave no room for a reasonable difference of opinion."  *West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 350 (9th Cir. 1989).  Conclusory allegations that sales quotas were unreasonable may not be adequate to raise a triable issue of fact.  *Lou Buch Assoc. Inc. v. Sanyo Electric, Inc.*, 1990 U.S. App.

11

LEXIS 10892, *9-10 (6th Cir. June 27, 1990).  But where the plaintiff goes beyond

mere allegations, and presents evidence about the reasonableness of quotas,

summary judgment is not appropriate.  *Boyd v. Tornier, Inc.*, 2009 WL 1657900, *

8 (S.D. Ill. June 12, 2009); *Snow v. Healthsouth Corp.*, 2001 WL 395124, *23

(S.D. Ind. March 21, 2001).

Here, the Court finds genuine issues of material fact exist as to the

reasonableness of the quotas set by Nevro.  Nevro asserts it followed an objective,

reasonable process for setting sales quotas, and there is no evidence that it deviated

from its standard process in setting Brodock's quotas.  According to Nevro, its

sales quotas are based on the company's estimated revenue, sales history, and

growth trajectory.

Brodock has offered evidence contradicting Nevro's assertions.  For

instance, Nevro management admitted the quota process was "speculative" and

"subjective" (Doc. 75-2 at 51-52), and in email communications referred to

Nevro's quotas as "emotional," based on "about 6 formulas," and analogized the

process to looking "into the crystal ball 3 months out" to "try and predict the

future."  (Docs. 87, 88, 89.)

Brodock further points out that his quotas for the third and fourth quarters of

2019 were the second highest out of over 200 salespeople nationwide, despite the

large geographic size of his territory, and were more than twice as high as any

12

other sales manager in his region.  (Docs. 99, 118.)  Brodock also provided

statistics showing his quota increase of 33.3% from the second quarter to the third

quarter of 2019 was greater than any increase since the first year of his

employment when he built his sales territory from scratch.  (Doc. 116.)  In

addition, Brodock challenges Nevro's assertion that it did not deviate from its

standard process in setting his quotas for the second half of 2019.  Brodock notes

that Nevro set the sales quotas on a semiannual basis for the second quarter of

2019, rather than quarterly, as it had done at all other times during his employment.

(Docs. 75-3 at 16; 85 at ¶ 24.)

  Because Brodock has provided evidence from which a rational trier of fact

could find his quotas were unreasonable, summary judgment is not appropriate.

    b.  <u>Notice and Opportunity to Cure</u>

  With regard to Brodock's claim that Nevro was contractually required to

provide notice and an opportunity to cure deficiencies prior to termination, the

Court finds the clear language of the 2018 Amendment demonstrates otherwise.

The 2018 Amendment – which governed the terms of Brodock's employment at

the time of his termination – gave Nevro discretion to terminate the agreement for

"Cause."  The 2018 Amendment provided:

> "Cause" will mean any one or more of the following: (i) your
> commission of any felony or crime involving dishonesty; (ii) your
> participation in any fraud, misrepresentation, omission of material
> fact, or other act of dishonesty against the Company; (iii) your willful

breach of your contractual, statutory or common law duties to the Company or any third-party (including, but not limited to, your violation or breach of any provision, representation, or obligation under the Offer Letter Agreement, this Amendment, or the Proprietary Information and Inventions Agreement), (iv) your habitual neglect of any duty detailed in section (iii); (v) your continued incapacity to perform any duty detailed in section (iii); or (vi) consistent failure to demonstrate adequate performance of your sales-related duties, as evidenced by two consecutive quarters during the Term of failure to meet 70% of your sales quota under the Plans; provided however, that **any breach, neglect or nonperformance as set forth in clauses (iii), (iv) or (v) shall constitute cause only if it is not cured to the reasonable satisfaction of NEVRO within 30 days following NEVRO's written notice to you** of such breach, neglect, or nonperformance.

(Doc. 75-20 at 4-5 (emphasis added)).

The provision is unambiguous; it required Nevro to provide notice and opportunity to cure only with regard to subsections (iii), (iv) and (v). Nevro terminated Brodock pursuant to subsection (vi). Thus, Nevro was not contractually obligated to provide written notice to Brodock prior to termination.

In response to Nevro's motion for summary judgment, Brodock does not contest that the contract gave Nevro the right to terminate without notice with regard to subsection (vi). Instead, Brodock now argues the 2018 Amendment did not, in fact, allow Nevro to terminate his employment. Brodock parses the following language in the contract to make his argument:

NEVRO shall have the discretion to terminate or modify this Agreement during the Term for Cause, as defined below, and you shall have the right to terminate your employment or this agreement during the Term for Good Reason, as defined below.

14

(*Id.* at 4.)

Brodock argues that the language differs in designating Nevro's termination rights versus his.  He points out that the contract states Nevro had discretion to terminate or modify only "this Agreement," whereas Brodock had discretion to terminate "your employment or this agreement."  Thus, in Brodock's view, the agreement distinguished between the right to terminate "this Agreement" from termination of "your employment."  Brodock contends that the term "this Agreement" is undefined, and can be reasonably interpreted as only meaning the 2018 Amendment, rather than the overall employment relationship.  He concludes, therefore, that the termination provision merely set forth the conditions under which Nevro could terminate the 2018 Amendment, and revert Brodock's employment back to the terms of his 2016 Agreement.

"The interpretation and construction of a contract is a question of law." *Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 926 (Mont. 2012). Under the rules of contract interpretation, "[i]f the language of a contract is unambiguous – i.e., reasonably susceptible to only one construction – the duty of the court is to apply the language as written." *Mary J. Baker Revocable Tr. v. Cenex Harvest States, Cooperatives, Inc.*, 164 P.3d 851, 857 (Mont. 2007). *See also Northwest Oil & Refining Co. v. Honolulu Oil Corp.*, 195 F.Supp. 281, 286 (D. Mont. 1961) ("The intention of the parties is to be deduced from the language

employed by them, and the terms of the contract, where unambiguous, are conclusive.").  In assessing ambiguity, the contract must be construed as a whole.  *Northwest Oil & Refining Co.*, 195 F.Supp. at 286.

"The existence of an ambiguity must be determined on an objective basis, and an ambiguity exists only if the language is susceptible to at least two reasonable but conflicting meanings."  *Corp. Air v. Edwards Jet Ctr.*, 190 P.3d 1111, 1121 (Mont. 2008).  An ambiguity does not arise merely "'by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation.'" *Mary J. Baker*, 164 P.3d at 857 (quoting 11 Williston on Contracts § 30:4, 51-54 (4th ed. 1999)).

Although the termination provision was perhaps unartfully drafted, the 2018 Amendment is not ambiguous.  When the entire agreement is read as a whole and in context, the 2018 Amendment allowed Nevro to terminate Brodock's employment for cause.  To interpret the language otherwise, would not be reasonable.  For example, "cause" for termination of the 2018 Agreement included, not only failure to meet quotas, but any "violation or breach of any provision, representation, or obligation under the [2016 Agreement]."  It would make no sense that the consequence of Brodock breaching his 2016 Agreement would be to revert his employment back to the 2016 Agreement.  The 2018 Amendment also

provided that "cause" for termination included actions such as committing a felony or engaging in fraud or an act of dishonesty against Nevro.  It is unreasonable to conclude that the parties intended such conduct would merely lead to returning Brodock to a prior bonus structure.

Moreover, the 2018 Amendment modified Brodock's employment status with Nevro.  Prior the 2018 Amendment, Brodock was employed "at-will."  But the 2018 Amendment expressly stated "at-will employment shall not apply."  The only reasonable interpretation of this language, combined with the inclusion of a definition of "cause" in the contract, is that Nevro could terminate Brodock's employment for one of the six enumerated reasons during the term of the 2018 Amendment.  The 2018 Agreement, therefore, is reasonably susceptible to only one construction – Nevro had the authority to terminate Brodock's employment for cause as defined in the contract.

As such, the Court finds the 2018 Amendment is not ambiguous.  It contains an employment termination provision, and permitted Nevro to terminate Brodock under subsection (vi) without prior notice or an opportunity to cure. Nevro is, therefore, entitled to summary judgment on this aspect of Brodock's breach of contract claim.

/ / /

/ / /

**B.     Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing**

Brodock alleges Nevro violated the implied covenant of good faith and fair dealing by setting unreasonable quotas and by failing to give him requisite notice of and an opportunity to cure his performance deficiencies.  (Doc. 6. at ¶ 75.) Nevro moves for summary judgment, arguing the claim should be dismissed as duplicative.  Nevro asserts that because Brodock cannot establish breach of the express terms of the contract, he cannot establish that Nevro breached the implied covenant.  Alternatively, Nevro argues there is no evidence Nevro acted dishonestly or unreasonably.

The Montana Supreme Court has developed the following framework for application of breach of implied covenant claims under Montana law:

> (1) every contract contains an implied covenant of good faith and fair dealing; (2) a breach of the covenant is a breach of the contract; (3) a breach of an express term of the contract is not a prerequisite to a breach of the implied covenant; (4) the conduct required by the implied covenant is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade; and (5) when one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.

*Weldon v. Montana Bank*, 885 P.2d 511, 515 (Mont. 1994).  "Proof of an alleged breach of the implied covenant of good faith and fair dealing requires proof that the offending party acted under the contract terms in a manner that was a dishonest or unreasonable deviation from prevailing commercial standards of reasonableness

in the trade, thereby denying the non-breaching party the benefit of the bargain."
*House v. U.S. Bank Nat'l Ass'n*, 481 P.3d 820, 831 (Mont. 2021).

As discussed above, there are genuine issues of material fact regarding whether Nevro breached the contract by setting unreasonable quotas. Likewise, there are disputed issues regarding Brodock's implied covenant of good faith and fair dealing claim.

      a.    <u>Quotas</u>

Brodock points to a host of factors that he argues were out of his control and demonstrate disputed issues of fact regarding whether his quotas were unreasonably set. For example, Brodock contends his second quarter 2019 sales were artificially inflated by one physician, Dr. Vangilder, moving procedures up to the second quarter to accommodate an international vacation. (Doc. 85 at 22.) Brodock argues Nevro unreasonably used the aberrant second quarter sales as a baseline for the third and fourth quarter quotas.

Brodock also points out that his Therapy Consultant, Gina Frank, transferred out of his territory in July 2019, and her replacement required training and had health issues which impacted her ability to work. (Doc. 84 at ¶ 110; Doc. 92 at 2-3.) Brodock states Frank's departure, combined with the fact Nevro took away his Therapy Support Specialists for the fourth quarter, required him to spend more

time providing patient care, and less time pursuing sales opportunities. (Doc. 85 at 23-24.)

Brodock further points out that the Wyoming portion of his territory was transferred to another DSM (Doc. 75-1 at 19), and one of his physician's, Dr. Oriente, unexpectedly closed his practice resulting in a loss of $240,000 - $390,000 in revenue for the second half of 2019. (Doc. 85 at 22.) Brodock also notes that he spent a considerable amount of time establishing a relationship with Billings Clinic which did not provide revenue in 2019, but provided a significant long-term opportunity. (Doc. 93 at 3, 7.)

In addition, Brodock argues Nevro acted in a dishonest manner in terminating him for "cause" because Nevro's stated reason for termination was pretextual. For example, Brodock points to email communications that indicate Nevro may have made the decision to terminate him before the end of the fourth quarter. In September and October 2019, Susan Bryan, who was ultimately hired to replace Brodock, sent proposed business plans for Brodock's territory to Brodock's supervisor, Grant Dunham. (Doc. 120.) Dunham, in turn, forwarded Bryan's proposals to Area Vice President Steve Frazier. (*Id.* at 7.) On November 20, 2019, a Nevro executive directed Frazier to terminate Brodock "@ end of term agreement. 1/1/2019." Thereafter, on December 17, 2019, Frazier sent an internal email stating "[t]erminate Kevin Brodock 12/31 if possible. Kathy mentioned his

term agreement allows us to separate after two quarters below 70% to plan." (Doc. 98 at 9.)  Frazier also directed to "have offer ready for Kevin's backfill." (*Id.*) Nevro's global vice president of sales acknowledged in his deposition that it would have been "premature" to terminate Brodock before his fourth quarter revenue was known.  (Doc. 75-3 at 45.)

Brodock further contends Nevro's treatment of him unreasonably deviated from its treatment of other sales employees.  Nevro admitted that in 2019, there were sales employees it "did not terminate who had consecutive quarters during which they failed to meet 70% of their sales quotas." (Doc. 84-34 at 5.)  Brodock has also produced a spreadsheet showing there were several salespeople who failed to meet 70% of their quotas for consecutive quarters in 2019.  (Doc. 118.) Brodock further notes that his replacement, Bryan, repeatedly failed to attain her quotas, even though they were lower than Brodock's for the same territory, and her first quarter 2020 revenue was down nearly 50% from his fourth quarter 2019 revenue.  (Doc. 86 at 6.)  Yet Nevro maintains Susan Bryan has had no performance issues.  (Doc. 75-4 at 14-15.)  Thus, Brodock has presented evidence from which a jury could conclude that Nevro acted dishonestly or outside accepted commercial practices in applying its quota attainment policy.

Nevro counters that it reasonably set Brodock's quotas higher because of his experience and performance record, and contests Brodock's interpretation of the

facts that he highlights.  For example, Nevro counters Brodock's argument that his quotas were unreasonable, by pointing out that his quota for the third quarter of 2019 ($1,000,000) was lower than his actual quota attainment for the second quarter of 2019 ($1,011,464).  (Doc. 84 at ¶ 98.)  Nevro asserts that Brodock's territory did not generate enough trial procedures in the third quarter of 2019 to qualify for TSS support in the fourth quarter (Doc. 75-3 at 37); that Gina Frank requested to transfer because she didn't want to work with Brodock (Doc. 75-2 at 48); and that her replacement's pregnancy was not a "health issue" that interfered with her performance (Doc. 75-4 at 13; Doc. 75-2 at 44).  Nevro also states it transferred the Wyoming portion of Brodock's territory to another District Sales Manager because the key physician in that territory refused to work with Brodock. (Doc. 75-2 at 20, 27.)  Nevro further argues Brodock's contentions regarding the lost revenue from Dr. Oriente closing his practice are contradicted by Brodock's July 2019 business plan, which showed Dr. Oriente was only expected to complete 4 trial procedures in the third quarter.  (Doc. 75-24 at 3.)  Nevro also asserts Brodock had difficulties with Billings Clinic due to a personal conflict he created with key staff at the hospital, and that the time he spent trying to repair the damage did not excuse his underperformance there or elsewhere.  (Doc. 75-2 at 41; Doc. 75-3 at 28-29; Doc. 75-25.)

With regard to Brodock's pretextual termination argument, Nevro argues Brodock's supervisor met Susan Bryan entirely by chance in an operating room in September 2019, and she sent an unprompted proposed business plan to him. (Doc. 75-2 at 34.)  Nevro also states its internal communications about terminating Brodock simply reflected the reality that Brodock was underperforming, so the company was considering its options to address the issue.  (Doc. 75-3 at 32; Doc. 75-30.)  Nevro theorizes that Brodock's personal distractions in 2019, including an outside business venture and a divorce, contributed to his failure to achieve his sales goals.  (Doc. 75-28; Doc. 75-1 at 55-56; Doc. 76.)

But these diverging interpretations of the evidence only serve to highlight the fact-intensive nature of this claim.  Weighing the parties' competing interpretations of the evidence is a task for the jury.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]").  The Court finds there are a myriad of disputed issues of fact regarding Brodock's claim that Nevro breached the implied covenant of good faith and fair dealing by setting unreasonable quotas.  As such, summary judgment is not appropriate on this aspect of his claim.

/ / /

/ / /

23

b.    <u>Notice and Opportunity to Cure</u>

Unlike his quota claim, however, Brodock's theory that Nevro breached the implied covenant for terminating him without notice and an opportunity to cure deficiencies fails as a matter of law.  As previously discussed, the 2018 Amendment gave Nevro authority to terminate Brodock's employment under subsection (vi) without prior notice or opportunity to cure.  Brodock cannot invoke the implied covenant of good faith and fair dealing to alter Nevro's rights under the agreement.  *Farris v. Hutchinson*, 254 Mont. 334, 339, 838 P.2d 374, 377 (1992) ("No obligation can be implied which would result in the obliteration of a right expressly given under a written contract.").

Accordingly, the Court recommends that Nevro's Motion for Summary Judgment be granted in part and denied in part as to Count III.

**C.    Count IV – Tortious Interference with Economic Advantage**

Brodock alleges Nevro intentionally interfered with his potential employment/business opportunities by invoking alleged the non-compete provision in the 2016 Agreement, and the non-disparage obligations in the Separation Agreement.  (Doc. 6 at ¶¶ 82-89.)  Nevro moves for summary judgment, arguing Brodock's claim fails because Nevro never invoked the non-compete agreement, and Nevro had the legal right to enforce its other agreements with Brodock.

24

To state a claim for intentional interference with prospective economic advantage under Montana law, the plaintiff must show: "(1) an intentional and willful act; (2) calculated to cause damage to the plaintiff's business; (3) with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) the act results in actual damage or loss." *Wingfield v. Dep't of Public Health and Human Servs.*, 463 P.3d 452, 454 (Mont. 2020). Generally, a defendant is not liable for intentional interference if it had the legal right to act as it did. *Id.*

Brodock's 2016 Agreement contained a non-compete provision, which precluded Brodock from competing with, entering into or engaging in a business similar to that of Nevro for a period of 12 months. (Doc. 75-6 at 2.)  Brodock asserts that the non-compete agreement is "unlawful and unenforceable under Montana law." (Doc. 83 at 27.)

Nevro does not address the enforceability of the agreement.  Instead, it asserts the non-compete agreement cannot serve as a basis for a tortious inference claim because it unconditionally released Brodock from the provision.  But the evidence relevant to this claim is not as unequivocal as Nevro contends.

After Brodock was terminated, he asked Nevro to release him from the non-compete provision. (Doc. 75-33 at 3-4.)  Nevro asserts that its Associate General Counsel, Kathleen Determann, told Brodock in a phone call that the company

agreed not to enforce the non-compete.  (Doc. 75-35 at ¶ 12.)  Nevro maintains the release was unconditional.  (*Id.*; Doc. 75-3 at 31, 41.)  Brodock disagrees, and points to an email summarizing the conversation, where Determann stated: "(3) you will sign and return your Separation Agreement and abide by its terms, including non-disparagement and not disclosing Nevro confidential business information.  With respect to this last item, Nevro has agreed that it will not enforce the non-competition provision of your Offer Letter."  (Doc. 103.)  Brodock states that he was told by Nevro he would only be released from the non-compete provision if he signed the separation agreement.  (Doc. 85 at ¶ 57.)  He did not do so.  Thus, there are disputed issues of fact as to whether Nevro released Brodock from the non-compete agreement, or whether the release was conditioned upon Brodock executing the separation agreement.

Nevro further argues it was within its legal rights to instruct Brodock to follow his agreements.  Brodock counters that Nevro threatened to enforce a proposed separation agreement to which he had not agreed.

On January 16, 2020, Nevro emailed Brodock, stating that it believed he had made disparaging comments about the company and shared "confidential information about [his] termination, operational changes and company sales revenue."  (Doc. 75-33 at 2.)  Nevro stated Brodock's actions were "in violation of your Separation Agreement dated December 30, 2020 as well as your Propriety

26

Information and Inventions Agreement (PIIA)[.]"  (*Id.*)  Nevro indicated it would

pursue "legal action for breach of contract, trade secret protection and damages" if

there were "further incidents."  (*Id.*)  While Brodock did enter into the PIIA in

2016, he never signed the proposed Separation Agreement.  (Doc. 75-1 at 57; Doc.

75-3 at 33.)  Thus, Brodock has produced evidence indicating Nevro threatened

legal action against him for violating an agreement the parties never executed.

Nevro acknowledges that Brodock never signed the agreement, but asserts it

was not clear at the time of its email that Brodock would not do so.  (Doc. 73 at

31.)  Nevro also asserts that it had a good faith belief that Brodock's conduct

would violate the agreement.  Thus, Nevro argues, even if its email concerning the

Separation Agreement interfered with Brodock's prospective economic advantage,

"Nevro is not liable because it acted to protect its legitimate business interest."

(*Id.*)  But Nevro's purpose in sending the email, and whether it acted in good faith

in doing so, is for the jury to decide.  See, *McCoy v. Mitsuboshi Cutlery, Inc*., 67

F.3d 917, 924 (Fed. Cir. 1995) ("Under the defense of legal justification, a party

exercising its legal rights in good faith cannot tortiously interfere with another's

prospective business relations.  Whether the party acted in good faith is a question

of fact for the jury. . . .") (internal citations omitted); *Prime Contracting, Inc. v.

Wal-Mart Stores, Inc.*, 2008 WL 2859014, at *5 (E.D. Ky. July 22, 2008) ("In the

context of tortious interference claims, questions like 'good faith,' 'improper

27

purpose,' and 'motive' are fact questions properly decided by a jury.") (internal citations and quotations omitted); *Eleutian Tech., LLC v. Glob. Educ. Techs., LLC*, 2009 WL 10672361, at *4 (D. Wyo. Jan. 23, 2009) (whether defendant acted in good faith as defense to tortious interference is a question of fact for the jury).

Accordingly, the Court finds there are genuine issues of material fact whether Nevro unconditionally released Brodock from his non-compete agreement, and whether it attempted to enforce the unsigned Separation Agreement. The Court, therefore, recommends that Nevro's Motion for Summary Judgment be denied with regard to Count IV.

### D.    Count V – Infliction of Emotional Distress

Brodock alleges Nevro negligently or intentionally caused him serious or severe emotional distress. (Doc. 6 at ¶¶ 90-95.) Nevro moves for summary judgment, arguing the claim fails because it is premised solely on the alleged violation of his employment contract, and there is no evidence he experienced serious or severe emotional distress.

Nevro correctly asserts that in a breach of contract action, "recovery is prohibited for emotional or mental distress, except in those actions involving actual physical injury to the plaintiff." Mont. Code Ann. § 27-1-310. Nevertheless, Montana law recognizes an independent cause of action for infliction of emotional distress "under circumstances where serious or severe emotional distress to the

28

plaintiff was the reasonably foreseeable consequence of the defendant's negligent act or omission." *Sacco v. High Country Ind. Press, Inc.*, 896 P.2d 411, 426 (Mont. 1995).

"To constitute 'serious' or 'severe,' the emotional distress must be 'so severe no reasonable person could be expected to endure it.'" *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 344 (Mont. 2013). The question of whether the threshold level of emotional distress can be found is for the Court to determine. *Sacco*, 896 P.2d at 425 ("It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.") (*quoting* Restatement (Second) of Torts, § 46, comment j at 78).

The Montana Supreme Court has pointed to several factors for determining whether there is sufficient evidence of severe emotional distress, including: (1) whether the plaintiff had any physical manifestations of emotional distress; (2) whether counseling was sought or recommended; (3) whether the plaintiff took medication or the use of medication dramatically increased; (4) whether the plaintiff had continuous nights of sleeplessness or days without appetite; (5) whether the plaintiff maintained close relationships with family members and friends; (6) the duration of the emotional distress; and (7) the circumstances under

which the infliction incurred, including whether the plaintiff witnessed a distressing event. *Feller*, 299 P.3d at 345.

Here, the Court finds Brodock has not presented evidence of the type of emotional distress necessary to demonstrate serious or severe compensable emotional distress. Brodock testified at deposition that after being terminated he felt worried, stressed, anxious, on edge, down and embarrassed. (Doc. 75-1 at 71.) He said he also had trouble sleeping and gained weight. (*Id.*) Brodock testified that his symptoms were the worst during the first two weeks following his termination. (*Id.* at 70.)

Brodock saw his regular primary care provider for his regularly scheduled physical examinations, but did not see a therapist or seek specialized medical treatment. (*Id.* at 71.) It is undisputed that he had been treated for insomnia and anxiety for years prior to his termination. (*Id.* at 73-74.) Brodock stated that he increased his daily dose of anxiety medication from 10 mg once per day to 10 mg twice per day, after being terminated. (*Id.*) But his prescription did not change, and his medical records indicate that since September 2019, his prescribed dosage was 10 mg twice per day. (Doc. 122 at 3, 6.)

The Court finds that consideration of the *Feller* factors does not lead to the conclusion that Brodock's emotional distress rises to the level where severe emotional distress may be found. Brodock has not sought counseling, dramatically

increased his use of medication, did not experience a lengthy period of emotional distress, and has not alleged he was unable to maintain close relationships with friends and family.  As this district has noted, being "distraught and anxious" after losing a job, even when it causes a change in appetite and inability to sleep "is not the type of emotional distress that a reasonable person, ordinarily constituted . . . would be unable to cope with." *Newman v. Lambert School Dist. Nos. 4 & 86*, 2009 WL 10701662, *6 (D. Mont. July 9, 2009).

The Court recognizes that Brodock understandably experienced stress and anxiety after losing his employment.  Nevertheless, taken as a whole, his testimony does not show that his emotional distress was so serious or severe that "no reasonable person could be expected to endure it." *Feller*, 299 P.3d at 344.

Accordingly, Nevro's Motion for Summary Judgment should be granted on Count V of the Complaint.

### E.    Count VI – Declaratory Relief

Brodock seeks a declaration that he "is not subject to any non-compete or non-disparage obligations to Nevro." (Doc. 6 at 17.)  Nevro argues Brodock's declaratory judgment claim fails because there is no case or controversy between the parties concerning the non-compete or non-disparage agreements.  Nevro asserts Brodock's post-termination restrictions have expired and his request for declaratory judgment is moot.

31

"Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a plaintiff must establish standing by showing 'that there is a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment.'" *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 658 (9th Cir. 2002) citing *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  An actual controversy must exist at all stages of the litigation, not only when the complaint is filed.  *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).

A request for declaratory judgment concerning a non-compete agreement is moot if "(1) the non-compete agreement has expired and (2) the opposing party has not or 'will not pursue any claims to enforce the noncompete provisions or to recover any damages from Plaintiffs related to the non-compete provisions.'" *Healy v. Qognify, Inc.*, 2020 WL 136589, *3 (C.D. Cal. Jan. 10, 2020) citing *Imtiaz Khan v. K2 Pure Sols., LP*, 2013 WL 4744006, *4 (Sept. 3, 2013).

Here, the non-compete provision expired on January 15, 2021, one year after Brodock's termination from Nevro.  (Doc. 84 at ¶ 160; Doc. 75-6 at 2.)  Further, Nevro's counsel has represented to the Court through its briefing "that it will *not* enforce Plaintiff's non-compete provision."  (Doc. 125 at 16 (emphasis in original).)  "A representation to a court that a party will not seek to enforce a covenant not to compete completely moots a claim for declaratory relief seeking to invalidate a covenant not to compete."  *Howard v. Octagon, Inc.*, 2013 WL

5122191, *4 (N.D. Cal. Sept. 13, 2013).  Accordingly, the Court finds Brodock's claim for declaratory judgment with regard to the non-compete provision is moot.

The Court finds, however, that there is a justiciable case or controversy between the parties as it relates to Brodock's claim for declaratory relief regarding the non-disparage agreement.  Nevro has maintained that it "had a legal right to remind Brodock of his obligations and to ask that he stop causing harm to the company."  (Doc. 73 at 37.)  Nevro has also asserted counterclaims against Brodock for his post-termination conduct.  As such, Brodock's claim with regard to the non-disparage agreement is not moot.

Nevro's Motion for Summary Judgement should, therefore, be granted in part, and denied in part as to Count VI.

## IV.   BRODOCK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Nevro has asserted counterclaims against Brodock for Breach of Contract and Breach of the Duty of Loyalty.  Nevro argues Brodock materially breached the PIIA and his duty of loyalty to Nevro when he emailed Nevro's customers after he learned of his termination.  Nevro contends Brodock improperly revealed confidential information and attempted to negatively influence Nevro's customers.

Brodock does not challenge the viability of these claims, but argues Nevro has not produced any evidence of actual damages as a result of Brodock's email correspondence.

33

It is well settled under Montana law that a breach of contract is actionable "regardless of whether actual damages stemmed from the breach." *Puryer v. HSBC Bank USA, Nat'l Ass'n*, 419 P.3d 105, 111 (Mont. 2018).  In the event there is no proof of actual damages, "recovery may be for nominal damages." *Rickards v. Aultman & Taylor Mach. Co.*, 210 P. 82, 83 (Mont. 1922).  Similarly, with respect to a claim for breach of the duty of loyalty, "[w]hen a breach of duty has caused no appreciable detriment to the party affected, the party may recover nominal damages."  Mont. Code Ann. § 27-1-204.

Where actual damages are sought, such as for lost profits, damages may only be awarded "if such loss is shown to be the 'natural and direct result of the act of the defendant' and if the loss is not speculative."  *Olson v. Parchen*, 816 P.2d 423, 427 (Mont. 1991).  *See also Stensvad v. Miners & Merchants Bank of Roundup*, 640 P.2d 1303, 1310 (Mont. 1982) ("Damages for loss of profits may be awarded if not speculative.")  Thus, there must be some basis for establishing actual damages.

Here, the Court finds Nevro has cited to sufficient evidence to raise a genuine dispute of material fact regarding actual damages.  Nevro claims it suffered damages for lost profits as a result of Brodock's emails.  To support its claim, Nevro has produced an expert report from Ryan S. Duffy, calculating its alleged lost profits damages.  (Doc. 69.)  Mr. Duffy's report sets forth his

methodology and relies on documentary evidence, such as Nevro annual reports. (*Id.*)  Nevro also cites to a report showing there was a notable drop in Nevro product usage by Brodock's best customer, Dr. Goodman, whose office received one of Plaintiff's emails.  (Doc. 75-26.)

Nevro further points out that several providers reacted negatively to Brodock's emails, indicating his communications may have caused harm to Nevro's reputation.  For example, one provider wrote: "I can't tell you enough how shitty that is . . . I think that's bullshit even though I don't know the numbers." (Doc. 75-32 at 2.)  Another responded: "Well I think this is BS!"  (*Id.* at 4.)  One provider who indicated she wanted to continue to use Nevro products for her patients, nevertheless expressed disapproval of Nevro, stating: "What a blow to be dealt at the end of the holiday season, I think that is really crummy of them to do that."  (*Id.* at 8.)

Drawing all inferences in the light most favorable to the non-moving party, the Court finds this evidence is sufficient to raise an issue of material fact as to whether Nevro suffered damages from Brodock's post-termination conduct.

Brodock points to weaknesses in Nevro's evidence, such as the fact Nevro has not produced a statement from any physician stating they discontinued using Nevro products due to Brodock's emails, and deposition testimony where Nevro's Rule 30(b)(6) deponent indicated Nevro would "be speculating" as to what effect

35

Brodock's communications had on sales.  (Doc. 70-2 at 3-4.)  Brodock also

highlights evidence in his favor, including three declarations from Nevro

customers stating they were not negatively influenced by Brodock's termination or

his emails (Doc. 84-39; Doc. 84-40; Doc. 84-41), as well as his own expert's

report.  (Doc. 68-5.)  Further, Brodock raises several points attacking Mr. Duffy's

assumptions, which a jury may ultimately find persuasive.  But Brodock's

arguments go to the weight of the evidence, and present factual disputes that are

for the trier of fact to resolve.  *See Wood v. Old Trapper Taxi*, 952 P.2d 1375, 1381

(Mont. 1997) ("Juries have an uncanny ability to evaluate the credibility of a

witness, especially an expert.  Problems presented in a case such as this, namely

conflicting expert testimony and missing evidence, are best solved by juries.").

In sum, the Court finds that Nevro has come forth with sufficient evidence to

establish there are genuine issues of material fact for trial on its counterclaims.

The Court, therefore, recommends that Brodock's Motion for Partial Summary

Judgment be denied.

## V.    CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.    Nevro's Motion for Summary Judgment (Doc. 72) be **GRANTED in

part and DENIED in part**; and

36

2.     Brodock's Motion for Partial Summary Judgment (Doc. 66) be

**DENIED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy

of the Findings and Recommendations of United States Magistrate Judge upon the

parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after service hereof, or

objection is waived.

**IT IS ORDERED**.

DATED this 3rd day of August, 2022.

TIMOTHY J. CAVAN
United States Magistrate Judge